**Mary WILLIAMS, Administratrix of the Estate of David Williams, Plaintiff,**

**v.**

**The CITY OF CHICAGO; Fred Rice, Superintendent of Police; James Rosas and Stanley Walsh, Directors of the Office of Professional Standards; Officer Cadigan, Chief of Training; Bruce Wagner, #5328; Raymond Macey, and Robert Campbell, Defendants.**

No. 84 C 5098.

United States District Court, N.D. Illinois, E.D.

April 6, 1987.

Jan Susler, Jeffrey H. Haas, Peoples Law Office, Chicago, Ill., for plaintiff.

Judson H. Miner, Corp. Counsel, William A. Wenzel, Zaldwaynaka L. Scott, Asst. Corp. Counsels, Office of Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff is the mother of the late David Williams and administratrix of his estate. Chicago Police Officer Bruce Wagner shot and killed David Williams on December 15, 1983. Officers Raymond Macey and Robert Campbell, who apparently accompanied Wagner in answering the call which led to

the death of Williams, are defendants in the instant case along with Wagner. The officers maintain that Williams lunged at them with a knife, which plaintiff denies. That dispute, however, does not concern us at present. More than two and a half years after plaintiff first filed her complaint, this suit is still bogged down in what this court has called "the quicksand of [42 U.S.C.] § 1983 pleading requirements." *Salkin v. Washington*, 628 F.Supp. 138, 139 (N.D.Ill.1986).

Plaintiff believes that the City of Chicago, and defendants Fred Rice, James Rosas, Stanley Walsh and one Officer Cadigan in their capacity as supervisory officials, helped to legally cause her son's death by their failure to discipline officers with a history of violence and their failure to train officers for confrontations with mentally ill persons. This court previously dismissed the counts of her complaint dealing with municipal and supervisory liability because they failed to meet the standards of *Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir.1985), which requires that a § 1983 complaint against a municipality include some fact which would support municipal liability. *Williams v. City of Chicago*, No. 84 C 5098 (N.D.Ill. July 2, 1985) [Available on WESTLAW, DCT database]. She has returned with new counts IX and X.

The City, Rice, Walsh and Rosas contend that the new version still fails to meet the standards of *Strauss*, and move to dismiss.[1] Recent decisions from the Supreme Court and this circuit, however, teach that much of the quicksand was more apparent than real. This court finds that plaintiff's revised counts now state claims and denies the motion.[2]

### I. Old and New Pleadings

Plaintiff all along has alleged that a customary "code of silence" exists through which officers "cover up" for each other to deflect investigations of incidents of violence by the Department's Office of Profes-

---

1. The defendant identified as "Officer Cadigan" has, it seems, not yet been served.

2. It does so, however, with a recognition that the claims substantially increase the complexity

of the lawsuit, as will be apparent from the discussion below, without necessarily increasing the likelihood or amount of recovery.

sional Standards, and that supervisory personnel know of and tacitly encourage this practice. Thus, she contends, the Department has no effective policy for disciplining, counseling or reassigning officers with a propensity for violence and brutality. The lack of an effective policy tacitly encourages brutality, and allegedly helped to legally cause injuries like David Williams' death by putting such officers in situations where they were likely to brutally deprive citizens of their constitutional rights. Her original count, however, contained no facts to support these conclusory allegations.

Plaintiff now has enlarged her failure-to-discipline count by alleging that seven citizen complaints of excessive violence and brutality had been filed against Officer Wagner between 1978 and 1983, a rate of somewhat more than one a year. In one of the incidents leading to those complaints Wagner allegedly shot a citizen in the back, rendering him a quadriplegic. In another, a suburban police officer allegedly testified that Wagner kicked a citizen in the head while the latter was handcuffed and under restraint. Plaintiff notes that despite these indicators of violent propensities the City, through its supervisory personnel, failed to discipline Wagner, give him psychological counseling, or reassign him.

Plaintiff's original failure-to-train count alleged failure to properly train officers in the use of deadly force. In the new count she contends that the supervisors knew or should have known that officers would need to respond appropriately to persons in need of mental treatment such as David Williams. However, they gave no training in the recognition of or the proper responses to such persons to defendant Wagner, as he testified in his deposition. Moreover, they gave no, or inadequate, training to defendant Macey, since he testified that he "probably" had received such training but had absolutely no recollection of what that training was. Plaintiff thus asserts a policy or custom of inadequate training for officers in dealing with the mentally ill, which contributed to the death of her son.

The defendants contend in their motion that despite the revisions, these counts do not allege enough specific facts which could give rise to municipal or supervisory liability. Thus they must be dismissed under *Strauss*. They also read *Strauss'* rejection of a complaint which included only the facts of a single incident, 760 F.2d at 767, as extending to a complaint based on the acts of a single officer. They further point to the *Strauss* court's comment that "the number of [citizen] complaints filed [against police officers], without more, indicates nothing." *Id.* at 769. Thus they conclude that plaintiff's argument based on citizen complaints is without value. They also contend that neither municipal nor supervisory liability exists without an affirmative act by supervisors which authorized or approved police officer misconduct as official policy, citing *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976), and point out that plaintiff alleges no such affirmative act. Thus the failure-to-discipline count cannot stand. As to the failure-to-train count, plaintiff alleges only one incident of purported overreaction to a mentally ill victim, namely the incident involving her son. According to defendants' reading of *Strauss* and *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), municipal or supervisory liability can never rest on just one incident.

## II. Municipal and Supervisory Liability Under § 1983

■ Defendants are reading *Strauss*, *Rizzo* and *Tuttle* too broadly. For example, *Strauss* did not set aside the basic standards for pleading a claim in federal courts. 760 F.2d at 768, *citing Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *cf. Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Rather, as the Seventh Circuit's decision in *Hossman v. Blunk* indicates, 784 F.2d 793, 797 (7th Cir.1986), *Strauss* merely stands for the general proposition that to state a § 1983 claim against a municipality, a complaint should include something more than mere "boilerplate" that simply repeats the language of court opinions which have defined municipal liability. *See Strauss*, 760 F.2d at 768. The complaint must also include a

fact or facts which could support municipal liability for the injury of which plaintiff complains. *Blunk*, 784 F.2d at 796; *Strauss*, 760 F.2d at 767. As the *Strauss* court itself noted, its holding merely followed from the principle for all complaints that each claim should show some factual basis. *Id.* at 768; *see Salkin*, 628 F.Supp. at 141; *A.T. v. County of Cook*, 613 F.Supp. 775, 782 (N.D.Ill.1985). Defendants' reading of *Strauss* as requiring great specificity in § 1983 pleadings confuses the general principle with the court's application of that principle to the situation before it. The *Strauss* plaintiff asserted a difficult claim in which, for example, municipal liability would not legally exist without proof of more than one incident. Thus he needed more facts to show a basis for liability. Not all § 1983 claims have the same requirements. *See Salkin*, 628 F.Supp. at 141; *Zwarton v. City of Chicago*, 625 F.Supp. 1211, 1212 (N.D.Ill.1985) ("there is no exclusive formula"); *Strama v. City of Chicago*, 617 F.Supp. 422, 424–425 (N.D.Ill.1985).

Therefore we start our analysis of plaintiff's pleadings by looking at the basic requirements of municipal liability under § 1983. Because the statute itself only imposes liability on persons who "subject, or cause to be subjected," others to the deprivation of their rights, a municipality (or any other corporation) cannot be held vicariously liable regardless of its fault merely because it employed a tortfeasor. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691–692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Rather, the municipality itself must be at fault—must fairly be said to have "caused" the deprivation. *Id.* at 692, 98 S.Ct. at 2036; *Tuttle*, 471 U.S. at 818, 105 S.Ct. at 2433 (plurality opinion), 828 (Brennan, J., joined by two other justices, concurring); *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); *see also Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).

That requirement is more easily stated than implemented, since a municipality, like all corporations, is a juristic person which can act only through its agents and employees. The conduct of some of its agents or employees must be attributable to it under § 1983 or it would never be liable. The *Monell* court spoke of liability when the deprivation stemmed from a "policy or custom" of the municipality. 436 U.S. at 694, 98 S.Ct. at 2037. The actual contours of the range of conduct covered by that phrase have been, in the words of the *Tuttle* plurality, "somewhat sketchy." 471 U.S. at 820, 105 S.Ct. at 2434; *see also Wolf-Lillie v. Sonquist*, 699 F.2d 864, 870 (7th Cir.1983). The Supreme Court, however, has taken major steps toward clarification recently with *Tuttle* and with *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

■ Taken together, these opinions indicate that municipal tort liability under § 1983 essentially borrows the concepts of corporate contract liability from the law of agency. A corporation is bound by the actions and knowledge of its board of directors, or by officers placed highly enough to have express or inherent authority to act for the corporation in the matter in question. *See, e.g., Rouse Woodstock, Inc. v. Surety Federal Savings & Loan Ass'n*, 630 F.Supp. 1004, 1010 (N.D.Ill.1986); *Evanston Bank v. ContiCommodity Services, Inc.*, 623 F.Supp. 1014, 1030–1031, 1034–1035 (N.D.Ill.1985). Similarly, a municipality is liable in tort under § 1983 when one can fairly ascribe the wrong to persons placed highly enough to be municipal policymakers. *Pembaur*, 475 U.S. at ——, 106 S.Ct. at 1298; *Tuttle*, 471 U.S. at 821 (plurality), 829, 833, 105 S.Ct. at 2435, 2439, 2441 (Brennan, J., concurring); *see Strama*, 617 F.Supp. at 425 (reaching same result on a reading of *Tuttle* alone). Put another way, the municipality itself cannot have caused the deprivation unless the conduct of not just any employee, but rather responsible municipal authorities, played some part in the deprivation. *Cf. Rizzo*, 423 U.S. at 377, 96 S.Ct. at 607.

■ In light of *Tuttle* and *Pembaur*, the much-discussed phrase, "municipal policy or custom," turns out to describe ways

of tracing a wrong back to persons placed highly enough to be policymakers. A single act of misconduct by a lower-level municipal employee is not municipal policy. *Tuttle*, 471 U.S. at 821 (plurality), 831, 833, 105 S.Ct. at 2440, 2441 (Brennan, J., concurring) (patrolman on police force). But a single act by a high-level officer can be municipal policy for which the municipality is liable under § 1983, if that officer is placed highly enough to be an authorized decisionmaker for the matter in question. *Pembaur*, 475 U.S. at ——, ——, 106 S.Ct. at 1299, 1301 (county prosecutor). Of course, municipal liability also lies for injuries caused by a written policy formally adopted by the municipality's equivalent of a private corporation's board of directors, *see Tuttle*, 471 U.S. at 819–820, 105 S.Ct. at 2434 (plurality); *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037, or by the course of action over time which policymakers consciously and openly choose. *Tuttle*, 471 U.S. at 823, 105 S.Ct. at 2436 (plurality). But the key element in liability is not the formality, the conscious choice, or the number of acts or incidents. Rather, it is whether the action of which plaintiff complains can be traced or fairly attributed to an official who has sufficient authority to be a policymaker. *Tuttle*, 471 U.S. at 822–823 (plurality), 832, 105 S.Ct. at 2435–2436, 2440 (Brennan, J., concurring); *Webb v. City of Chester*, 813 F.2d 824, 828–29 (7th Cir.1987) (single employment decision by Board of Fire and Police Commissioners could support municipal liability); *cf. Rizzo*, 423 U.S. at 377, 96 S.Ct. at 607.

The number of acts or incidents becomes relevant only as the connection between a municipal policymaker and the conduct which caused the injury becomes more tenuous. *See Tuttle*, 471 U.S. at 822 (plurality), 832, 105 S.Ct. at 2435, 2440 (Brennan, J., concurring). The conduct of low-level employees does not make policy; it might, however, reflect municipal policy or custom. Without a written policy or direct policymaker participation, one cannot simply assume that it does on the basis of a single incident. To do so would be to impose vicarious liability on a city under another name. *Tuttle*, 471 U.S. at 831, 105

S.Ct. at 2440 (Brennan, J., concurring). But the more often such incidents occur, the more one begins to suspect that in fact a policy or custom established or permitted by high-level authorities lies behind the conduct of the low-level employees. Repetition of the incident thus supports municipal liability when the injury does not stem directly from a formal policy or the acts of a policymaker.

▮ In other words, recurring similar incidents may permit an inference, despite a lack of direct evidence of policymaker involvement, that responsible authorities have encouraged or approved such conduct, or at least that they knew or should have known of such conduct and were deliberately indifferent to it. *Brandon v. Holt*, 469 U.S. 464, 466–467, 105 S.Ct. 873, 875, 83 L.Ed.2d 878 (1985); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir.1986); *Powe v. City of Chicago*, 664 F.2d 639, 651 (7th Cir.1981). If so, the conduct of the low-level employees is fairly attributable in part to policymakers. The policymakers' stance can then fairly be described as a custom or policy of the municipality which helped to legally cause the deprivation. *Brandon*, 469 U.S. at 467, 105 S.Ct. at 875 (supervisors' failure to establish procedures which would uncover police misconduct); *Bohen v. City of East Chicago*, 799 F.2d 1180, 1189 (7th Cir.1986) (supervisors' inaction in face of repeated sexual harassment). Such liability may well be better described as liability on the basis of custom (a habitual practice, a pattern of conduct) rather than policy (a conscious choice of a course of action, formally adopted by decisionmakers), as the Seventh Circuit has suggested. *Jones*, 787 F.2d at 203–204; *Wolf-Lillie*, 699 F.2d at 870. But it is municipal liability nonetheless. In cases where a plaintiff lacks direct evidence of policymaker involvement and so must depend on inference, and only in such cases, municipal liability ordinarily requires a showing of more than one incident—not because a municipality cannot be liable for the first incident, but because the injury cannot be firmly attributed to policymakers otherwise. *See Pembaur*, 475 U.S. at ——,

106 S.Ct. at 1299; *Tuttle*, 471 U.S. at 822–824 (plurality), 832, 105 S.Ct. at 2440 (Brennan, J., concurring).

■ Exactly the same principles apply to a claim against a municipal official in his or her official capacity. A § 1983 suit against an official in his official, as opposed to his individual, capacity, is treated in all respects as a suit against the governmental entity itself. Liability results only if it could also be imposed against the entity, *i.e.,* on a showing of a custom or policy which caused or helped to cause the deprivation. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985); *Brandon,* 469 U.S. at 472, 105 S.Ct. at 878; *Henry v. Farmer City State Bank,* 808 F.2d 1228, 1238 (7th Cir.1986). The official capacity suit in most instances simply represents a slightly more direct route conceptually to the same result. If the official sued is placed highly enough to be a policymaker, as is ordinarily true, then proving that his or her actions (or inaction) helped to cause the deprivation also simultaneously proves municipal causation through a policy or custom, and so proves municipal liability. *Brandon,* 469 U.S. at 472–473, 105 S.Ct. at 878; *Wolf-Lillie,* 699 F.2d at 870; *see also Salkin,* 628 F.Supp. at 142; *Bootz v. Childs,* 627 F.Supp. 94, 104 (N.D.Ill.1985).

## III. Count IX: Failure to Discipline

■ With these principles in mind, we turn to plaintiff's allegations. Plaintiff contends, in essence, that with seven citizen complaints of brutality against Wagner, police supervisory personnel either knew or should have known that he had a propensity for violence, yet they took no action against him. Thus, she offers Wagner's case to raise an inference that the Department either tacitly encourages brutality or has no effective system in place for weeding out officers with a tendency to brutality. The City argues that allegations concerning only one officer are insufficient to satisfy *Strauss;* that citizen complaints which led to no discipline prove nothing since the complaints could well have been groundless; and that under *Rizzo* the municipality can only be liable for its action, not its inaction.

Taking the City's last point first, we do not read *Rizzo* that way, and neither does the Seventh Circuit. For one thing, *Rizzo* stems from the period before the *Monell* decision, when § 1983 suits did not lie against local governmental entities. *See Monell,* 436 U.S. at 663, 98 S.Ct. at 2021. Thus it cannot serve as authority for interpreting a principle of municipal liability for municipal policy or custom which the Supreme Court had not yet articulated. *Cf. Tuttle,* 471 U.S. at 841, 105 S.Ct. at 2445 (Stevens, J., dissenting) ("policy or custom" language originated with *Monell* decision). Moreover, in *Rizzo* the plaintiff sought injunctive relief, 423 U.S. at 375–377, 96 S.Ct. at 607, thus implicating considerations not present in a suit for damages. The court also doubted whether the *Rizzo* plaintiffs had standing to sue. 423 U.S. at 372, 96 S.Ct. at 604.

Nevertheless, *Rizzo* appears to stand for no more than the proposition that a federal court cannot enjoin municipal officials for deprivations of constitutional rights unless the plaintiffs have affirmatively shown that the officials' conduct played some part in causing those deprivations. *See* 423 U.S. at 371, 377, 96 S.Ct. at 604, 607. That proposition seems entirely consistent with the principles of municipal liability which derive from *Pembaur* and *Tuttle,* that the injury must be fairly attributable to the conduct of municipal policymakers. *See, e.g., Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436 (plurality) ("there must be an affirmative link between the policy and the particular constitutional violation alleged"). A showing of official inaction in the face of an obvious danger can satisfy that standard of causation. *See Brandon,* 469 U.S. at 467, 105 S.Ct. at 875. In any case, it is settled law in this circuit that just as a municipality may be liable for the acts of its decisionmakers which deprive persons of their constitutional rights, so it may be liable when its decisionmakers fail to act or fail to make a policy and that inaction leads to a deprivation. *Kasper v. Board of Election Commissioners,* 814 F.2d 332, 344 (7th Cir.1987); *Bohen,* 799 F.2d at 1188–

1189; *Jones*, 787 F.2d at 204–205; *Lenard v. Argento*, 699 F.2d 874, 885–886 (7th Cir.), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). Claims based on policymaker inaction tend to be significantly more difficult to prove, *see Lenard*, 699 F.2d at 886, but they exist.

 The question, then, is whether in count IX plaintiff has alleged, in the language of *Strauss*, a "fact or facts tending to support [her] allegation that a municipal policy [or custom] exists that could have caused [David Williams'] injury." 760 F.2d at 769. We think she has. She does not allege that the Department had a formal written policy of encouraging brutality, or that policymakers themselves actively participated in brutality. Thus the injury comes at some distance from any municipal policymaker, and she needs allegations of more than a single incident with a single victim to support municipal liability. However, she has those. A municipality can fairly be at fault in a case of police brutality if its policymakers knew or should have known that an officer had propensities for brutality and they either encouraged, acquiesced in, or were deliberately indifferent to those propensities. *Brandon*, 469 U.S. at 466–467, 105 S.Ct. at 875. *Strauss*, 760 F.2d at 769; *Lenard*, 699 F.2d at 885–886. Here she alleges that seven citizen complaints about Officer Wagner should have alerted policymakers to his violent nature. Their inaction, she says, must indicate encouragement, acquiescence or deliberate indifference.

That only one officer may have had such tendencies is not decisive. As the *Tuttle* plurality noted, the municipality cannot be liable if, despite careful scrutiny of applicants, it ends up discovering that it hired one "bad apple." No fault could be ascribed to the municipality under those circumstances. 471 U.S. at 821, 105 S.Ct. at 2435. However, once it has evidence that an apple is bad, it can be faulted for leaving even one bad apple in the barrel. The successful § 1983 claim in *Brandon* involved the misconduct over time of only one policeman. 469 U.S. at 466, 105 S.Ct. at 875; *cf. Carr v. City of Chicago*, 630

F.Supp. 932, 934 (N.D.Ill.1986) (plaintiff arrested nine times in similar incidents did not need to allege that other persons had also been arrested to satisfy *Strauss*). Plaintiff does not need to plead that more than one officer had a history of violence. What she needs instead are facts which could support a reasonable inference that Wagner's alleged use of excessive violence against David Williams was not an isolated incident in his career and that policymakers knew that. *See Strauss*, 760 F.2d at 769; *Benskin v. Addison Township*, 635 F.Supp. 1014, 1017–1018 (N.D.Ill.1986); *cf. Kasper*, 814 F.2d at 344 (municipality liable for vote fraud by agent of elections board if "the Board, despite knowing of the practice, has done nothing to make it difficult"). Alternatively, facts which indicate a failure to set up effective investigative procedures to weed out persons likely to violate rights would suffice. Such facts could support an inference of the deliberate supervisory indifference for which the municipality could be liable. *Brandon*, 469 U.S. at 467, 105 S.Ct. at 875; *Jones*, 787 F.2d at 207; *Black v. Stephens*, 662 F.2d 181, 190–191 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). The seven citizen complaints against Wagner, for purposes of a motion to dismiss, are the beginnings of support for an inference of such knowledge or indifference.

The *Strauss* court's comment, 760 F.2d at 769, that "the number of complaints filed, without more, indicates nothing" is not to the contrary. "Lesson Number One in the study of law is that general language in an opinion must not be ripped from its context to make a rule far broader than the factual circumstances which called forth the language." *FDIC v. O'Neil*, 809 F.2d 350, 354 (7th Cir.1987). The *Strauss* court confronted a plaintiff who had failed to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." 760 F.2d at 768, quoting *Conley*, 355 U.S. at 47, 78 S.Ct. at 102. The facts he had alleged did not suffice in themselves to prove municipal liability if true. More importantly, the complaint gave no hint of how he could use them to prove liability. He alleged a cus-

tom of retaining policemen with histories of violence. His complaint, however, merely included facts about the total number of citizen complaints filed against the entire Department and the low percentage that were sustained. 760 F.2d at 768. Like the statistics about an entire department in *Rizzo*, without a basis for comparison such generalized, summary statistics do not necessarily indicate a problem in the department. Thus they can say nothing about whether a supervisor was or should have been aware of a problem. *See* 423 U.S. at 369, 375, 96 S.Ct. at 606.

Here, however, plaintiff has pled facts which at least could lead to municipal liability and which themselves give notice of how she intends to use them. She refers not to all citizen complaints filed with the Department but to the complaints against one policeman. Of course, even that use of complaints, standing alone, does not constitute a fact which could prove liability. Without some basis for finding that the accumulation of complaints provided a warning, a trier of fact could not reasonably infer from the number of complaints alone that the City was aware that Wagner had a propensity to use excessive force. Against only the number of complaints, the City can contend in its defense that none of the complaints against Wagner were sustained after departmental investigation. Supervisors would be entitled to assume that none of the complaints were justified. But a legally relevant basis for comparison is at least implicit here: the number of citizen complaints filed against other officers with similar duty assignments. Plaintiff obviously intends to show that Wagner accumulated significantly more complaints, accusing him of more serious kinds of incidents, than the average similarly situated officer.

We of course have no way of knowing at this stage whether or not Wagner's complaints experience was high. Like the citizen complaints in *Strauss*, the bare numbers, without more, mean little. But unlike the numbers in Strauss, these numbers, with more, could mean something, and plaintiff has at least hinted at what her "more" will be. In contrast to the com-

plaint in *Strauss*, relief could be granted under some sets of facts which could be proved consistent with her allegations. *Cf. Hishon*, 467 U.S. at 73, 104 S.Ct. at 2232; *A.T.*, 613 F.Supp. at 732; *Lowers v. City of Streator*, 627 F.Supp. 244, 247 (N.D.Ill. 1985). A relevant basis for comparison exists, as it did not in *Strauss*. That basis—the complaints experience of similarly situated officers—definitely was or should have been within the City's knowledge. Thus the City is fairly on notice of the grounds upon which plaintiff's claim rests. She will seek to prove that the number of and nature of citizen complaints against Wagner, in light of the City's own complaints experience with other officers, caused the City to have the awareness of Wagner's propensities for violence, or the deliberate indifference to them, which leads to municipal liability. In short, plaintiff has alleged facts in count IX which, if true, would support municipal liability in certain circumstances yet to be proved. Plaintiff has complied with the requirements of *Strauss*.

### IV. Count X: Failure to Train

■ Plaintiff alleges in count X that the City and Police Department decisionmakers failed to adequately train officers against the likelihood that they would face a mentally ill person. She supports that allegation with the facts that Officer Wagner says he had no such training and Officer Macey remembers no part of it. The City contends that because she alleges no other incident of violence to a mentally disturbed person, it cannot be liable.

Plaintiff would only need to allege more than one incident, however, if there was some difficulty in attributing the conduct which allegedly caused her injury to a municipal policymaker. Surely one may assume, for purposes of a motion to dismiss, that decisions on the scope and content of the training program for police officers rest with Police Department policymakers in the first instance. The *Tuttle* Court found no fault with one approach in the trial below in that case, through which the plaintiff had sought to impose liability on a municipality using evidence of the actual

scope and content of the training program for police officers which indicated gross inadequacies in that program. 471 U.S. at 814 (plurality), 827, 105 S.Ct. at 2431, 2438 (Brennan, J., concurring). The difficulty was rather that under the trial court's instruction, the jury could have found liability either on that evidence or on a "policy" inferred from a single act of misconduct by one low-level officer, and there was no way to tell which route the jury had chosen. 471 U.S. at 821 (plurality), 827, 105 S.Ct. at 2435, 2438 (Brennan, J., concurring). Since the scope and conduct of officer training is traceable to policymakers, it constitutes a municipal policy. If in fact David Williams' death was caused in part by inadequacies in that training, then the municipality is just as responsible if he was the first victim of those inadequacies as if his death came later. *See Pembaur*, 475 U.S. at ——, 106 S.Ct. at 1299; *Jones v. City of Chicago*, 608 F.Supp. 994, 1000 (N.D.Ill. 1985), *aff'd*, 787 F.2d 200.

Plaintiff's problems with this count will not stem from connecting the injury to a municipal policy, but rather from demonstrating that there was any fault in the policy chosen. Without deciding the question, since the City's brief only tangentially raises it, it would appear that the standard for fault in this circuit for omissions from a training program requires "an extremely high degree of culpability." *Lenard*, 699 F.2d at 885. A city cannot train its police officers for every conceivable contingency, and "[n]o municipality may be held liable for its indifference to the mere *possibility* of a constitutional deprivation." *Jones*, 608 F.Supp. at 1000 (emphasis in original). Plaintiff would probably have to show that the frequency of confrontations with the mentally ill in Chicago is such that policymakers either knew, or should have known, that a deprivation of the disturbed person's rights through officer overreaction was quite likely unless all officers received special training for such confrontations. *See id.; Jones*, 787 F.2d at 206; *Lenard*, 699 F.2d at 886. A mere good faith error of judgment in the first consideration of the extent of a problem probably does not constitute fault for these purposes. *Jones*, 787 F.2d at 207.

Those issues, however, all go to questions of fact not before us on a motion to dismiss. Plaintiff faces a heavy burden in attempting to prove count X, but that in itself is no reason to dismiss it. *Strauss* requires only that she plead some fact or facts tending to show that a municipal policy exists that could have caused the injury. As in count IX, plaintiff has alleged facts which, if true, would support municipal liability in certain circumstances yet to be proved. Conceivably she could prove that in a city the size of Chicago confrontations with the mentally ill occur often enough that police decisionmakers should have anticipated them. The facts she alleges permit the inference that the Department had a policy of little or no training for such confrontations. Such a policy then could have contributed to the death of David Williams at the hands of Chicago police. Count X states a claim.

## CONCLUSION

The motion of defendants City of Chicago, Rice, Walsh and Rosas to dismiss plaintiff's counts IX and X is denied.